JASPER E. JONES, Judge.
Appellant, Peter Dale Copes, instituted this suit to recover damages he allegedly sustained because of defendant’s delay in supplying electricity for two irrigation pumps used to provide water for his rice crop. The defendant is Northeast Louisiana Power Cooperative, Inc., a nonprofit corporation with a franchise to provide electricity to its members in West Carroll Parish. Appellant appeals the trial court judgment rejecting his demand for damages. Defendant neither appealed nor answered the appeal. The assignments of error present two primary issues for decision:[1]
(1) did the trial court err in finding that defendant did not wrongfully deny and/or negligently delay electrical service to appellant; and
(2) did the trial court err in finding that the damage to the rice crop was caused by appellant’s neglect.
*1005 BACKGROUND FACTS
On April 21, 1983, appellant leased 100 acres of land from Richard McLemore for the purpose of producing rice. The property consisted of two noncontiguous tracts. Each tract had an electrically powered pump and irrigation well located upon it to irrigate crops grown on the tract. Defendant has a franchise from the West Carroll Police Jury to serve its members in West Carroll Parish with electricity and the defendant was the exclusive source of electric service in the area where appellant’s leased rice farm was located.
In April, 1982, Richard McLemore, appellant’s lessor, contracted with defendant for service to several wells, including the two wells on the leased property. Each contract was for a term of five years, but could be terminated by either party upon three months written notice. The contracts were nontransferable according to the bylaws of defendant. In the latter part of 1982, service was disconnected on all of McLemore’s wells because he failed to pay for the electricity consumed that year. The defendant had sued McLemore in an effort to collect for the electrical service and a hearing was pending on this suit on June 30, 1983.
During the early part of May, 1983, appellant planted his leased farm property in rice. Rain was abundant and the rice came up with a good stand and needed no water by irrigation until June 15.
On June 15, 1983, appellant went to defendant’s office in Oak Grove, La. and requested power. Appellant spoke to Mrs. Pat Brown and advised her that he was renting 100 acres of land from Richard McLemore and requested power for the two wells on the leased property. Appellant was told that he would have to pay $8,000.00 to satisfy the delinquent accounts of Mr. McLemore before power would be supplied. Appellant refused to pay the account of McLemore, but offered to put up $2,500.00 as a deposit, however, defendant refused to accept this deposit and provide service. On June 20, 1983, appellant telephoned defendant’s office in Winnsboro, La., and talked to Mr. Tucker, the defendant’s general manager who supervised the Oak Grove office. He asked for service on the two pumps and was told that $8,000.00 would be required before power would be supplied. Tucker acknowledged this conversation and that he had insisted upon the $8,000.00 as a condition precedent to supplying electricity to appellant. Tucker testified that he suggested to the appellant that he investigate, as an alternative, the possible use of a diesel generator. Tucker denied that appellant offered the deposit in this conversation or at any other time, but this denial by Tucker is unbelievable because he later testified that after he decided to give appellant service he planned to call Mike Lamb of the FHA where appellant was going to obtain the deposit, and stated “I’ll call Mike Lamb and find out if he is still going to give him the money to make the prepayment.” On June 20, 1983, or within a day or two thereafter, appellant met with Mr. Mike Lamb of the Farmers Home Administration who telephoned defendant’s Winnsboro office on appellant’s behalf. Mr. Lamb testified he was told by Tucker that plaintiff could only get electric service by paying the $8,000.00 past due bill. Appellant testified that he explored other means by which to power the irrigation pumps, but they were too costly. Subsequently, appellant notified Mr. McLe-more of his problems and Mr. McLemore directed his attorney to write a letter to defendant on behalf of appellant. This letter was written on June 30 by attorney, Harvey Perry, demanding electrical service for appellant. The letter advised the defendant that it would be liable for damages suffered by appellant due to its failure to provide service. Tucker testified that upon receipt of this letter he became extremely concerned about why Peter Dale had not earlier been told that he could have service by depositing a prepayment of $2,420.00. Tucker stated that he had decided to give appellant service sometime between June 20 and June 23, and advised his Oak Grove *1006 office manager to notify appellant.[2] Tucker stated that after he received Perry’s letter he called Mike Lamb at the FHA office on July 5 and advised him service was available to appellant upon making the prepayment deposit. On July 11, 1983, appellant was informed by his father that power would be supplied to the two wells in question if appellant would put up $2,420.00 as a prepayment. .Appellant immediately, upon receiving this information, paid the $2,420.00 and service was provided the same day. By this time, appellant’s rice was turning brown and even with the irrigation water he was able to harvest only about forty-one bushels per acre.
Mike Lamb, county supervisor for the FHA, who had earlier called Tucker seeking service for appellant and to whom Tucker had advised that the $8,000.00 delinquent account of McLemore would have to be paid before service would be provided, received a call from Tucker around July 1, 1983, with regard to appellant’s service. Tucker called Lamb to verify that appellant was leasing the property where the two pumps to be serviced were located. Tucker was told about the lease by Mrs. Brown of his Oak Grove office on June 15 and also by appellant in a phone call on June 20. There is no indication that Tucker sought verification of the lease on either of the earlier occasions. Lamb testified that on July 5 he received another phone call from Tucker and was then told defendant would pi’ovide the electrical service upon appellant filling out a membership application and making a prepayment of $2,420.00.
Defendant’s manager, Mr. John Tucker, testified that it was the policy of the co-op to require the landowner to co-sign with the lessee and guarantee payment of the electric bill. Mr. Tucker testified that this procedure was unavailable to appellant because the landowner, Mr. McLemore, owed defendant for service the previous year. Mr. Tucker testified that when the landowner could not guarantee the bill, the defendant had a policy of requiring a prepayment deposit from the renter as a condition of service and it was this policy that he decided to implement in order to make service available to appellant.[3] Mr. Tucker testified that he telephoned Mr. R.C. Gough, defendant’s Oak Grove office supervisor, between June 20 and 24 and instructed him to inform appellant that service would be provided if appellant would prepay $2,420.00. Mr. Tucker testified that when he received the letter from appellant’s attorney, he called Mr. Gough to determine if appellant had been in to arrange for service. Mr. Gough informed Mr. Tucker that appellant was advised of the fact that service would be extended, but appellant had not been in to make the necessary arrangements.
Mrs. Pat Brown, cashier at defendant’s Oak Grove office testified that appellant came in around June 15, 1983, and requested that the McLemore pumps be turned on. Mrs. Brown assumed that appellant was acting on behalf of McLemore and after *1007 checking with Tucker at defendant’s Winnsboro office she told him he would have to pay $8,000.00 to satisfy the delinquency account of McLemore before service would be provided. Mrs. Brown testified that when appellant refused to pay the McLemore account, she realized that appellant was acting on his own behalf and told him that she would inquire further. Mrs. Brown testified that she did not talk to appellant again until July 11,1983, when he filled out an application for membership and prepaid $2,420.00.
The trial court found that the lack of electrical service resulted in a lack of water to the rice crop and caused damage to appellant. The court, however, found that defendant did not wrongfully deny or negligently delay service to appellant. The court noted that defendant had entered into five year, nontransferable, contracts with Richard McLemore for electrical service and the contracts were still in effect when appellant sought service. The trial court also noted that appellant had periodically worked for Richard McLemore and this caused some confusion when appellant initially requested service. The trial court found that service was available to appellant during the first week of July, 1983, but that appellant did not make formal application until July 11, 1983. The trial judge determined that appellant’s loss was caused by his own neglect because appellant did not attempt to obtain electrical service until mid-June, 1983, and then only after the crop began to suffer from a lack of water. The trial court also noted that appellant did not attempt to clarify his lessee status until June 20, 1983, and did not contact Mr. Lamb until June 23, 1983. ISSUE No. 1 — DID DEFENDANT WRONGFULLY DENY AND/OR NEGLIGENTLY DELAY ELECTRICAL SERVICE TO APPELLANT?
Appellant contends the trial court erred in finding that defendant did not wrongfully deny and/or negligently delay electrical service to him. He argues the delay was caused by defendant’s attempt to collect the delinquent McLemore account. Appellant points out that he attempted to obtain electrical service from defendant on six different occasions between June 15 and June 30, 1983.[4] He further points out that once defendant decided to turn the power on, the task only took a few hours and, therefore, service could have been provided upon his initial request on June 15, 1983.
Defendant contends that the trial court was correct in finding that it did not wrongfully deny and/or negligently delay electrical service to appellant. Mr. John Tucker, manager of defendant, testified that defendant has an unwritten policy which requires a landlord to co-sign the application for electrical service with his tenant before service will be provided. However, that procedure was unavailable to appellant because his lessor, Mr. McLe-more, was in default on his electric bill for the previous year. Defendant points out that it had entered into a five year contract with Mr. McLemore in 1982 on the wells in question. According to defendant this contract was nontransferable and still in effect, although delinquent, when appellant requested service in June, 1983. Defendant argues the delay in making electrical service available to appellant was caused by the unique situation.
APPLICABLE LAW
LSA-C.C. art. 2315 provides in pertinent part;
“Every act of man that causes damage to another obliges him by whose fault it happened to repair it.”
LSA-C.C. art. 2316 provides:
“Every person is responsible for the damage he occasions not merely by his *1008 act, but by his negligence, his imprudence, or his want of skill.”
In Seals v. Morris, 410 So.2d 715, on remand, 423 So.2d 652, writ granted in part, 433 So.2d 686 (La. 1982) the Louisiana Supreme Court set forth the elements of a cause of action under LSA-C.C. arts. 2315 and 2316:
“Under these articles, the elements of a cause of action are fault, causation and damage. The existence of a legal duty coupled with a breach of that duty are prerequisites to any determination of fault. Whether a legal duty is owed by one party to another depends on the facts and circumstances of the ease and the relationship of the parties. In all cases duty can be stated generally as the obligation to conform to the standard of conduct of a reasonable man under like circumstances. A breach of a legal duty that causes damage to another makes the offender liable under the above articles.”
In the case of Birmingham Ry., Light & Power Co. v. Pratt & McCurdy, 187 Ala. 511, 65 So. 533 (1914) the Alabama Supreme Court referred to the tort cause of action against a supplier of natural gas.
“We think the wrong complained of had a remedy in tort for the reason that defendant was a public service corporation, carrying on a business monopolistic in nature, and owed the duty of furnishing gas to every one who would pay for it and comply with its reasonable regulations. The counts were framed in tort.”
In the instant case, the trial court found that defendant had a duty to provide electrical service to any seeking customer, absent some legitimate reason to deny service.[5] Tucker, the defendant’s general manager, testified the defendant provided exclusive electrical service in the area of appellant’s rice fields. The trial court also found that a public utility could not require a new customer to pay the delinquent charges of a former customer as a predicate to receiving service. The trial court, however, found that defendant did not wrongfully deny and/or negligently delay electrical service to appellant because:
(1) defendant had entered into five year contracts with Richard McLemore in 1982 on the property leased by appellant and these contracts were still in effect and nontransferable when appellant requested service in June, 1983;
(2) appellant had been employed by Mr. McLemore in the past and when appellant initially requested service, there was some confusion as to whether appellant was acting on his own behalf or on behalf of Mr. McLe-more;
(3) defendant was unaware of Mr. McLe-more’s default under his contract until it was advised by an attorney that McLemore had filed bankruptcy;
(4) service was made available to appellant during the first week of July, 1983; however, appellant did not make formal application until July 11, 1983; and
(5) on July 11, 1983, upon meeting the deposit requirements and making formal application, appellant was given service.
We conclude, as did the trial judge, that defendant has a duty to provide electrical service to a customer seeking service. Defendant breached that duty by requiring appellant to pay the past due *1009 McLemore account before service would be provided. New Orleans Gas Light & Banking Co. v. Paulding, 12 Rob. 378 (1845); LaNasa v. Sewerage & Water Board of New Orleans, 184 So.2d 622 (La. App. 4th Cir.1966), writ denied, 249 La. 197, 186 So.2d 158 (1966). See also Finnin v. New Orleans Public Service, Inc., 167 La. 122, 118 So. 860 (1928). Thus, if defendant’s breach of this duty was the legal cause of appellant’s loss, defendant is liable for the resulting damages.
For negligence to be actionable it must be a cause in fact and a legal cause of the injury. Legal cause requires a substantial proximate relation between the actions of a defendant and the harm which occurs. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980).
In the instant case, there is a substantial proximate relation between the denial of electrical service and the damage to appellant’s rice crop. There is no question that the rice crop was damaged due to lack of water. The fact that defendant had entered into a five year contract with Mr. McLemore in 1982 to provide electricity to the property leased by appellant is no excuse for refusing to supply power to appellant in 1983. LaNasa v. Sewage & Water Board of New Orleans, supra. The testimony establishes that appellant apprised defendant on June 15, 1983, that he was leasing the property in question from Mr. McLemore and there could be no violation of the McLemore contract by defendant providing service to McLemore’s lessee. The defendant’s general manager, Tucker, made it abundantly clear three times as results of direct inquiries for service by appellant, that no service would be supplied until McLemore’s bill was paid. Tucker told this to his Oak Grove office on June 15, told it to appellant on June 20, and told Mr. Lamb on June 23. He wasn’t denying service because of the contract that defendant had with McLemore which had been breached by McLemore by nonpayment of his bill. Defendant was not bound by this breached contract and Tucker wasn’t concerned about it while he was trying to collect McLemore’s bill from appellant. He reiterated three times he would give appellant service if appellant paid the bill. Tucker began attempting to use defendant’s contract with McLemore as the reason for not giving appellant service only after the defendant was sued for violating its duty to provide service to appellant. We note that the viability of the contract had not changed when Tucker, according to his testimony, decided to give appellant service between June 20 and June 23. The finding of the trial court that the contract excused defendant from giving appellant service is without merit.
The trial court finding that there was confusion as to whether appellant was seeking the service for McLemore is totally unsupported by the record. Appellant told defendant’s employee, Pat Brown, on his initial visit to defendant’s office, that he leased the property from McLemore. Pat Brown admitted that she clearly understood these were the facts from appellant’s responses to her attempt to collect from him McLemore’s bill. Mr. Tucker was told on June 20 by appellant that appellant had a lease from McLemore. Mr. Tucker was told by Mr. Lamb on June 23 that appellant had a lease from McLemore.
The trial court’s finding that defendant was unaware of Mr. McLemore’s default under the contract until it was advised that McLemore had filed bankruptcy which occurred on or about June 22, 1983, is also totally unsupported by the record. The defendant not only knew McLemore had defaulted by not paying for his 1982 service but had sued McLemore for the past due bill and the case was set for trial on June 30, 1983. This factual finding by the trial court was irrelevant to the issue of denial and delay of service because the only reason given by Tucker for the denial of service was the requirement that the past due bill be first paid.
The trial court was clearly wrong in finding that defendant did not wrongfully deny and/or negligently delay electrical service to appellant.
*1010 ISSUE NO. 2 — DID THE TRIAL COURT ERR IN FINDING THAT THE DAMAGE TO THE RICE CROP WAS CAUSED BY APPELLANT’S NEGLECT?
When the trial court found appellant’s loss was caused by his own neglect, the trial court noted that appellant did not attempt to obtain service until mid-June, 1983. The trial court also noted that although service was available during the first week of July, appellant did not complete his membership requirements until July 11, 1983.
Appellant was not negligent in waiting until mid-June, 1983, to obtain electrical service. The record shows that service could have been provided on June 15, 1983, if the defendant would have agreed to provide the service. The defendant gave appellant service on July 11, the very day appellant deposited his $2,420.00 prepayment. The record further shows that appellant’s rice crop did not need water until June 15, 1983. We further conclude that appellant was not negligent in completing the membership requirements on July 11, 1983, although the testimony reveals that service was available during the first week of July, 1983. Appellant testified that on July 11, 1983, his father notified him that service would be provided upon a $2,420.00 deposit. This testimony is unrebutted. Defendant should have informed appellant, not his father, that service would be provided. The record reveals that the defendant did not even inform appellant’s father. The notice to the father was in fact provided by a clerk working for Mr. Lamb in the FHA office. Appellant was a customer of defendant and had been since January 17, 1980. His membership application contained his address. The defendant had denied appellant service on three earlier occasions and it had a duty to advise appellant of the availability of service. The defendant could have sent a messenger to appellant’s home, which was on its lines, or written him a letter. The defendant had no right to expect the notice to be delivered to appellant through the FHA and his father. The testimony of defendant’s Oak Grove manager that he gave notice of the availability of service direct to the appellant does not support the trial judge’s finding that the delay to July 11 was caused by appellant because the Oak Grove manager could not testify when he gave the information to appellant. Appellant states that he only talked to the Oak Grove manager on July 11, 1983. The evidence established that appellant had made a maximum effort to get the service and obtained it immediately upon his learning that it was available. It is totally unrealistic to believe that he would have delayed obtaining the water for his rice if he had known it was available. Under these circumstances, we cannot attribute the delay from the first week of July to July 11, 1983, to appellant. The defendant is not entitled to claim that the appellant is negligent because of his failure to receive the notice until July 11.
DAMAGES
Dr. Gerald Geisler testified that appellant’s rice would have yielded 100 bushels per acre if it had received adequate water. Based upon this expert’s testimony, the trial judge determined that appellant suffered $19,483.20 in damages. This conclusion was based upon 93 acres in production with an expected yield of 100 bushels per acre if appellant’s crop had received water at the time he initially applied for electrical service to his pumps. Appellant only produced 4,548 bushels from the entire operation and he, therefore, fell short of the estimated yield by 4,752 bushels. Based upon appellant’s future’s contract price of $4.10 per bushel, the trial judge determined the value of appellant's loss of production to be the amount of $19,483.20. We find no error in the trial judge’s calculation and we conclude that appellant is entitled to $19,438.20 for loss of production.
Appellant contends the trial court erred in finding there was insufficient evidence to establish damage to his credit reputation and damages for mental anguish. Appellant contends he sustained damage to his credit reputation because he lost his home *1011 and van as a result of the loss of production. Appellant contends he is entitled to damages for mental anguish as a result of constant worry over his deteriorating rice crop.
The trial judge’s factual findings are entitled to great weight and will not be disturbed on appellate review absent manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), on remand, 370 So.2d 1262, writ den., 374 So.2d 660 (1979). In order to recover for mental anguish, it must be proven that the plaintiff suffered more than minimal worry and inconvenience. Gele v. Markey, 387 So.2d 1162 (La.1980); Myers v. Basso, 381 So.2d 843 (La.App. 1st Cir.1980), writ denied, 384 So.2d 794 (La.1980).
In the instant case, we cannot say the trial judge abused his discretion in finding that appellant presented insufficient evidence to establish damage to his credit reputation or damages for mental anguish. Appellant testified that he did not seek psychiatric treatment as a result of his mental anguish and there is nothing in the record to substantiate these damages.
For the foregoing reasons, the judgment of the trial court rejecting appellant’s demand is reversed and judgment is rendered in favor of appellant and against defendant in the amount of $19,438.20 with legal interest from the date of judicial demand until paid. All costs are assessed against defendant.
REVERSED AND RENDERED.

. Appellant contends the trial court erred in:
(a) holding that electrical service could be denied to appellant because of non-payment of past due electric bills owed by the former occupant and owner, Richard McLemore, under a previous contract;
(b) finding that defendant did not wrongfully deny and/or negligently delay electrical service to appellant;
(c) finding that appellant's loss was occasioned by his own neglect;
(d) finding that appellant presented insufficient evidence to establish damage to his credit reputation, damage for mental anguish, damage for extra production expense, and crop loss damage beyond $19,428.20; and
(e) denying appellant’s claim and rendering a decision contrary to the law and evidence.

. We believe Tucker made his decision to let appellant have service at a date later than June 23 and that his testimony to the contrary is not credible. The reason for our conclusion is that Tucker was still demanding the sum of $8,000.00 at the time he talked to appellant on June 20 and at the time he talked to Mr. Lamb on June 23. The fact Tucker called Lamb on July 1 to verify appellant’s lease also indicates that prior to that date Tucker had not made a determination to let appellant have service without paying the $8,000.00 past due bill of McLe-more.

. "Q. And then you did require — you did require then that inception, like in June 15, that he — that these bills be taken care of before you give him service? Is that correct?
A. I think that’s what I told.
Q. Now, you — you decided to make some sort of arrangements with him in July sometime. Is — how do you decide how to treat each customer? Did you treat him the same way that you treated other customers wanting service or did you treat him differently? Had you required others to prepay for electrical services to irrigation wells?
A. We have had — on irrigation we have had some prepayments on rentors where they would not own the land. We’ve had so many — so many bills that were written off that we had to have some kind of policy or operation policy that we could require prepayments if the man doesn’t own his land. The only other alternative is — is if the land owner would guarantee the bill.”

. (1) Personally on June 15 at Oak Grove office;
(2) Telephone call to Tucker at Winnsboro on June 20;
(3) Visit to FHA manager, Mr. Lamb, June 20-23;
(4) Call defendant’s Board of Director Member, Mike Kilpatrick, after service was denied appellant;
(5) Call to Public Service Commission;
(6) Obtained demand letter from attorney Perry June 30.

. "The court is of the opinion that an electrical utility company is required to provide service to any customer seeking such service. This conclusion is based upon the very nature of the franchise agreement entered by the parish governing authority with the electrical utility company whereby the utility company agrees to render services to the citizens for the public good. Since the basis for formation of an electrical utility company is to provide service to the public, it logically follows that any person who is a member of the group of people to be served is entitled to service. Such policy is contained in the "Statement of Nondiscrimination” contained on page 1 of the by-laws of Northeast Louisiana Power Cooperative, Inc. Therefore, the Court is of the opinion that a public utility company cannot deny service to any person seeking such service.”